1. In an action of ejectment by an administrator, and a cross-action by the defendants for specific performance of an alleged contract by the decedent to deed to them the land involved, so that title would vest in them at his death, in consideration of certain personal services, the new testimony at the last trial, coupled with testimony similar to that at the previous trial, was sufficient to make a jury issue as to the existence of the alleged contract. There is no merit in the administrator's specific contention that the court properly directed the verdict in his favor because the defendants' proof failed to show certain essentials relating to the contract.
2. As to the defendants' compliance with the alleged contract under which title was to vest in them at the death of the decedent, a finding in their favor was authorized, since there was evidence showing performance of the services required during the lifetime of the decedent before the vesting of title; and there was no evidence that the performance of any service after his death had been made a condition subsequent to divest the previous vesting of title, so as to defeat their right of specific performance by reason of an alleged partial failure to perform an additional service after the decedent's death.
(a) Furthermore, under evidence that the administrator repudiated the alleged contract before any such failure to perform the subsequent service, the right to specific performance would not be defeated by a partial failure after such repudiation.
(b) There is no merit in the administrator's specific contention that the verdict in his favor was properly directed because the defendants did not show any performance of their alleged promise to make permanent improvements on the land during the lifetime of the decedent.
3. Nor is there any merit in the contention that the verdict was properly directed because the alleged contract was barred by the statute of limitations, since the statute was not pleaded and there was no objection to testimony on that ground; and since there was no evidence as to any demand by the defendants for the agreed deed, such as might have caused the statute to run from the time of the demand, and the suit was filed a year after the death of the decedent.
4. Under the above rulings, the court erred in directing the verdict for the plaintiff administrator.
 No. 14097. SEPTEMBER 18, 1942.
On November 2, 1938, H. C. Brogdon, as administrator of the estate of F. M. Hogan, filed an action in ejectment against Fred H. Hogan, nephew of the decedent, and Mrs. Maude Hogan, the nephew's wife, to recover a farm which it was alleged belonged to the decedent under a deed made to him in 1930 and remained in his possession until his death in March, 1937, but which the defendants *Page 475 
have thereafter held in their possession under some claim against the deceased. The defendants set up, in their answer in the nature of a cross-petition, an oral contract between themselves and the deceased uncle to devise or convey the land to them in consideration of certain personal services which were to be performed by them for the decedent and his brother, W. J. Hogan, father of the defendant, Fred H. Hogan, and which they alleged they had fully performed; and the defendants prayed for a specific performance of this alleged contract.
The case has been twice before this court before the present writ of error. After a verdict for the defendants on their cross-action and the refusal of a new trial, this court reversed the judgment on exceptions to the overruling of a general demurrer to the cross-action, and held that it was fatally defective in failing to set forth essential averments with respect to the contract which formed the basis of the cross-action. Brogdon v. Hogan, 189 Ga. 244
(5 S.E.2d 657).
Before any dismissal of the cross-action in the court below, the defendants amended and afterwards made other amendments thereto. The court then overruled demurrers to the cross-action as amended. A verdict was again rendered for the defendants, and a new trial was refused. A majority of this court then held that the petition as amended stated a cause of action, and that demurrers to the amended pleading were properly overruled; but held, upon a consideration of all the evidence, that the contract as pleaded by the cross-action had not been proved, and again reversed the judgment. It was, however, held that under the ruling as then made it was unnecessary to determine whether or not "the defendants have discharged the obligations resting upon them under the alleged agreement." Brogdon v. Hogan,191 Ga. 647, 657, 658 (13 S.E.2d 666).
On the third trial, after evidence on both sides was concluded, the court sustained the plaintiff's motion for a directed verdict against the cross-action, on the grounds: (1) that the evidence was insufficient to support any verdict for the defendants; and (2) that, "under the contract alleged in the petition, the evidence clearly shows, as to supporting and caring for W. J. Hogan [brother of decedent], the defendants in this case have failed to carry out their contract." The defendants now except to the refusal of a new *Page 476 
trial, on the ground that there were issues of fact under the pleadings and the evidence, which the jury should have passed upon, as to: (a) whether or not the defendants failed to carry out their part of the contract as to "supporting and caring for W. J. Hogan," the decedent's brother; and (b) whether or not the plaintiff administrator himself first breached and renounced the alleged contract, by filing an application to the ordinary in January, 1938, over the protest of the defendants, to sell the land involved, and thereby excused or relieved the defendants from further performance thereafter.
The particular alleged failure of the defendants with respect to the brother, W. J. Hogan, is, that the defendant, Fred H. Hogan, as guardian of W. J. Hogan, four months after the administrator filed his application to sell the land, filed a petition to the ordinary for leave to encroach on the corpus of the ward's estate, in order to pay for special nursing and treatment; that by the alleged contract between the defendants and their deceased uncle the defendants had undertaken to support W. J. Hogan, the brother, not only during the life of the uncle, but thereafter during the brother's lifetime; and that, having failed to perform the obligation as to the brother, they were not entitled to specific performance.
As finally amended — summarizing the substance of the cross-petition as stated in the last decision (191 Ga. 647) — the defendants alleged that in December, 1930, they contracted orally with their uncle that if they would move from where they were living to the described farm in question, cultivate, drain, improve, and build up the property, and maintain it as a home for the decedent uncle and his crippled brother, defendants' father, during the old age of the uncle and his brother, the uncle would purchase the property for the defendants (plaintiffs in the cross-action); and that legal title would be vested in them at his death "by deed or will." They alleged their full performance of the contract, and a failure by the decedent to vest legal title in them by either a deed or a will. As to the duration of services on behalf of the decedent's brother, W. J. Hogan, the cross-petition as amended alleged that title was to vest in the defendants at the death of the uncle, F. M. Hogan. The cross-petition is not clear as to whether obligatory services to the uncle's brother, W. J. Hogan, were to end at the death of the uncle, or were to continue until the death of the brother. The *Page 477 
uncle died in March, 1937. The brother lived until November 6, 1938. Under earlier pleadings, the two brothers were to be taken care of "during their lifetimes." However, by amendment with references to these services, the defendants alleged that they performed the services to the brothers from the date of the contract "to the time of the death of F. M. Hogan [the uncle], . . and that the said services were performed by these defendants in pursuance of said contract during said period."
The plaintiff filed no pleading, other than demurrers, in response to the cross-action and the amendments thereto. At the last trial the defendants introduced, in support of their cross-action, testimony additional to that in the previous trial, which in the last decision (191 Ga. 647) was summarized and held insufficient to prove the alleged contract with sufficient certainty and definiteness.
Miss Louise Hogan, daughter of the defendants, testified: "I heard the contract between [F. M. Hogan] and my father and mother about the purchase of this farm. The contract was that Mother and Daddy was to look after him and Granddad [W. J. Hogan], and make a comfortable home for them, and at [F. M. Hogan's] death the place was to go to Mother and Daddy. That was the contract, and it was made in the latter part of 1930. As to what month in 1930 I could not be positive; it must have been in November or December. . . I heard [F. M. Hogan, the uncle] say several times that he wanted to stay on with them, because Mother and Daddy was good to him, and he wanted a comfortable and liveable home as long as he lived, he and Granddad. That is what he said when he made the contract; that was the contract . . . The agreement that was made between [F. M. Hogan], my mother and father, was that they were to move down there at Plainville, Georgia, with him on the farm, and make a comfortable and liveable home for he and Granddad as long as he lived, and at his death the place was to be Mother's and Daddy's. That was the contract. . . He said he would make Father and Mother a straight deed to [the farm]. That is what he said that night [the night the contract was made]."
Besides the above-quoted direct testimony as to the making of the contract, which testimony was lacking at the previous trial, the defendants introduced testimony, not only from witnesses who had testified before, but from twelve new witnesses, as to alleged admissions *Page 478 
or statements made to them by F. M. Hogan, the deceased uncle, with regard to the alleged contract. In addition to reiterations or testimony, merely cumulative to that given at the previous trial, from the same or new witnesses, the following evidence appears: J. D. Ray testified that the decedent, F. M. Hogan, told him in 1935, when the witness mentioned that it was "such a nice farm," "Well, I bought the farm, but the contract betwixt Fred [defendant] and myself when I bought, . . we was to have a home, me and my brother, and Fred was to make the necessary improvements on the farm, and at his death it was to go to him and his wife." Frank Garland testified that the deceased uncle told him: "He bought this place. . . As to what he said the contract was — well, he said he bought the farm for [Fred Hogan] and his wife to take care of him and his brother, where he could be with him, . . for Fred and his wife, and they were to live with him, and they were to give him a home." C. E. Dodd testified to like effect, that the decedent said his understanding was with "Fred Hogan and his wife to have a home as long as I live, him and his brother, . . and then it was to go to them . . at his death. He said they was to take care of him as long as he lived, and his brother, Bill." Penny Hobgood, a new witness, said that the decedent told him: "When I bought this farm in 1930, the contract was that [Fred Hogan] was to take care of me and my brother to our deaths, and then it went to [the defendants]. . . Yes, he told me that the farm was to go to [them] at his death, that that was the contract." Henry Hawkins, a new witness, testified as to a conversation with the decedent, as follows: He said "the contract was between him and Fred and Mrs. Hogan . . for them to have a home after his death. . . He and Bill Hogan [the brother] were . . to stay right there with them the rest of his days. He told me that several times. . . Mr. Fred and Mrs. Maud . . were to take care of them. . . He told me he was buying the farm for them, . . for Freddie and Maudie; that is the way he talked, . . that it would be their place after his death." R. L. Hogan, a new witness, testified that in 1930 he had a letter from the decedent, which had since been lost, stating that "he had bought him a farm down there, and the contract with [the defendants] was he was giving it to them to take care of him and my father [W. J. Hogan] until their deaths. . . He had some *Page 479 
promise that they would take care of him as long as he lived; . . that was the substance of it, . . his first year there, I think; . . right after he bought the farm." Chester Scott, a new witness, said that he heard the decedent say he "had bought that place . . for [the defendants] to take care of him and clean the place up; that it was all growed up, and straighten the place up, that it was growed up terribly when he went there. . . The contract between him and [the defendants was] that at his death they would have what he had; that they was to have the farm. Yes, I heard him tell my father that, right there in my house." G. U. Barner, a new witness, testified that the decedent, in stating as to the purchase of the farm on which the decedent, his brother, and the defendants lived, said it was for a home to "live with them the balance of his life."
As to a compliance with the alleged contract by the defendants' moving from their former home to the farm in dispute, which was purchased by the decedent uncle, and by the defendants' living there with the decedent and his brother (father of the defendants), making a home for them and taking kindly care of both during both of their lives, there was considerable testimony to support a finding that the defendants fully performed those obligations. There was also testimony as to the defendants having attended to the special nursing required for the decrepit brother during the twenty months of his life after the death of the uncle, except as to charging for such special nursing during the final months of his last sickness. As to the ground of the plaintiff's motions for a directed verdict against the cross-action, that the undisputed evidence showed a failure on the part of the defendants to perform all of their alleged obligations in taking care of the uncle's brother after the death of the uncle, the pleadings and the testimony with reference to whether such an obligation was to extend beyond the death of the uncle are as stated above. The undisputed testimony seems to show that during the life of the uncle the defendants both furnished a home with general care, and furnished all special nursing required; and that they also furnished special nursing required for the brother for a year after the uncle's death and up to May, 1938. The plaintiff contends, under the last-stated ground for a directed verdict, that, instead of furnishing the special nursing without cost after that time, they charged the brother for that *Page 480 
service. The documentary evidence shows that in May, 1938, one of the defendants, Fred Hogan, as guardian of the brother, filed a petition to the court of ordinary, and alleged, that the brother had received $1000 as heir at law of the uncle, and was receiving $30 a month as a Confederate pension; that the $30 a month was insufficient for his maintenance and support, in that special care and attention to diet and bedding and special nursing were required; that petitioner had contracted with his wife (the other defendant), who had been performing those duties for several years, to continue; and petitioner prayed for leave to encroach on the corpus of the ward to the extent of $60 a month additional to the $30 income. On May 2, 1938, an order granting this authority was entered. The final returns of the guardian, which, after the brother's death on November 6, 1938, were filed with the ordinary on December 7, 1938, showed that he then claimed credit for special nursing by his wife in 1938, as follows: May 9, $90; June 1, $90; July 2, $90; August 1, $90; September 1, $90; October 1, $90; November 1, $90; a total of $630.
The defendants bringing the cross-action, besides contending that the evidence showed a full performance of all their obligations under the alleged contract, contend, as a reason for any nonperformance with regard to the uncle's brother, that under the evidence the plaintiff administrator, at the January term, 1938, had filed to the court of ordinary an application to sell, as a part of the uncle's estate, the farm on which they were living; that this was done over the defendants' protest; that after an adverse decision by the ordinary and the superior court as to the administrator's right to sell, he filed the present action of ejectment; and that these acts of the administrator constituted a breach of the contract made with the deceased uncle, excused the defendants from any further performance, and constituted a waiver of any right of forfeiture from any subsequent non-performance.
As to the contention that there was no evidence of the value of the personal services rendered by the defendants under their alleged contract, or of the relative value thereof in proportion to the value of the land, so as to render a decree of specific performance proper, there was sufficient evidence from the consideration in the deed to the deceased uncle, and date as to the value of the land and the value of the services, to have authorized a verdict for the defendants on those particular contentions. *Page 481 
As to the contention that the evidence failed to show the making of improvements on the land, as agreed by the defendants under their alleged contract, Henry Hawkins testified that in 1930 the farm "was in pretty bad shape; the ditches were grown up, ten or twelve feet on each side. Yes, Fred Hogan [defendant] worked there on the farm, worked all the time; . . he done some ditching. I done some myself, cleaning and clearing up. [He] paid me. . . He built some in 1931, I believe, a barn; started it I believe in the fall." Ed Sims testified, that he lived three years on the farm in dispute; that both the uncle and his brother were sick; that the witness "worked on the farm, cleaning up and ditching. . . Fred Hogan hired me to do that work, and he paid me for that work, and . . fed me while I lived over there and worked." Chester Scott testified, that he had lived with the defendants and their uncle for a year, he thought in 1936, "did ditching, and clearing up of land," returned and stayed with them until the uncle died; and that "Mr. Fred paid me for that work and paid me to stay there."
1. On this the third trial of an action in ejectment by an administrator, and a cross-action by the defendants for specific performance, decreeing title in them to the land sued for under an alleged contract with the decedent, there was evidence, additional to that at the former trial, from the daughter of the decedent's nephew and niece bringing the cross-action. This witness testified as to the particular terms of the contract, which she heard stated by the parties themselves at the time the agreement was made. Such testimony, supplemented by that of the witnesses at a former trial and numerous new witnesses as to subsequent admissions by the decedent with regard to the terms of the contract, was sufficient to make an issue for the jury as to the existence of the contract.
There is no merit in the specific contentions of the administrator, defendant in error, that the court properly directed the verdict in his favor, because there was no testimony, such as is required in a suit for specific performance of a contract for support, as to the value of the agreed personal services, or as to their value in comparison *Page 482 
with the value of the land to be acquired in consideration thereof. On this question there was testimony as to the nature and value of the services, and as to the value of the land by proof of the purchase-price and rental value, sufficient to have authorized a finding for the defendants.
2. As to whether or not, on this the third trial, there was proof as to compliance with the contract, which, as ruled above, the jury were authorized to find had been entered upon, the evidence appears to have been undisputed that those bringing the cross-action had fully performed, until the death of the uncle, the services which it was contracted they were to render, and had also fully performed the services on behalf of the uncle's brother so long as the uncle lived. Under this evidence, when taken in connection with the disputed evidence as to the existence and terms of the contract, which evidence as to the contract was that title to the land sued for was to vest in the defendants at the death of the deceased uncle, a verdict was authorized, but not demanded, in favor of the parties bringing the cross-action, irrespective of any failure on their part to care for the brother of the uncle until the death of the brother about a year and a half after that of the uncle. This is true for the reason that "The law inclines to construe conditions to be subsequent rather than precedent, and to be remediable by damages rather than by forfeiture." Code, § 85-902. Accordingly, if the contract existed as alleged, and as supported by conflicting evidence, specific performance would not be defeated by a partial failure to perform any promise remaining to be performed after the death of the uncle, at which time title was to vest, since there was no testimony that such a promise constituted a condition subsequent which might defeat the previous vesting of title. See McCardle v. Kennedy, 92 Ga. 198 (17 S.E. 1001, 44 Am. St. R. 85); Kytle v. Kytle, 128 Ga. 387 (2), 391 (57 S.E. 748); Brand v. Power, 110 Ga. 522 (36 S.E. 53);Wood v. Owen, 133 Ga. 751 (3) (66 S.E. 951); Davis v.Davis, 135 Ga. 116 (69 S.E. 172); McGhee v. Minor,188 Ga. 635 (4 S.E.2d 565); Schneider v. Smith, 189 Ga. 704
(7 S.E.2d 76), and cit.; House v. House,191 Ga. 678-680 (13 S.E.2d 817), and cit.
(a) Moreover, a grantor may expressly or impliedly waive his right to claim a forfeiture under such a contract; and a suit for specific performance will not be defeated by a partial failure of *Page 483 
the moving party to perform his obligations under the contract, where before such failure the opposite party has himself renounced or repudiated the contract with any subsequent benefits. Burkhalter v. DeLoach, 171 Ga. 384 (2, 3) (155 S.E. 513), and cit.; Smith v. David, 168 Ga. 511 (2, d, e), 526, 527 (148 S.E. 265); Wilkes v. Groover, 138 Ga. 407
(2) (75 S.E. 353); Jones v. Williams, 132 Ga. 782 (3), 784 (64 S.E. 1081). Accordingly, under the evidence that the plaintiff administrator repudiated the alleged contract for the support of the decedent and his brother, as to any performance with respect to the brother after the decedent's death, by attempting to sell the land involved through the court of ordinary, and by bringing this ejectment suit for the recovery of the land, the jury, for this additional reason, were not compelled to find for the administrator, upon the defendants' cross-action for specific performance, on the administrator's contention that they were not entitled to specific performance because after the decedent's death they had breached the alleged contract by charging the brother's estate with part of the expenses of special nursing during his last sickness. It does not appear that the defendants did any act showing an intention to charge for such services until after the plaintiff administrator had applied to the ordinary for leave to sell the land involved, or that they asked to take credit for payments for such services until after the administrator had filed the instant ejectment suit to recover the land.
(b) There is no merit in the specific contention of the plaintiff administrator that the judge properly directed the verdict in his favor, because the defendants bringing the cross-action failed to introduce any proof as to the making of agreed permanent improvements during the life of the decedent, such as clearing and ditching the land and erecting a barn, since there was testimony as to the performance of this part of the alleged agreement.
3. Nor is there merit in the additional contention of the administrator, that the alleged oral contract was made in 1930, that under the testimony of the defendants' daughter the land was to go to the defendants under a "straight deed" from their uncle, and therefore that the contract was barred by the statute of limitations. This is true since the plaintiff did not plead any statute or object to such testimony. Nor was there testimony as to any demand for such a deed, so as to cause any statute to begin to run; the deed, *Page 484 
with a reservation of a life-estate in the grantor, being one which might have been executed at any time before his death.
4. Under the preceding rulings, it was error to direct the verdict for the plaintiff administrator.
Judgment reversed. All the Justices concur.