1. There was no error in allowing the amendments, or in overruling the demurrers to the petition as amended.
2. The evidence was insufficient to sustain the verdict, and it was erroneous to refuse to grant a new trial.
 No. 13448. FEBRUARY 13, 1941. REHEARING DENIED MARCH 19, 1941.
This is the same case as that reported in 189 Ga. 244, where the general nature of the case is shown. On the second trial evidence was introduced, showing the treatment accorded F. M. Hogan and W. J. Hogan, how the farm was managed, etc. Those portions of the evidence relating to the existence of the contract relied on by defendants in error are here given. As to the making of the agreement, the evidence was as follows: Walt Fowler, referring to a conversation he had had several years previously with F. M. Hogan, testified: "After we had some water and got some chairs, he got off on the subject of making a will to Fred and his wife to the farm. I don't know whether it is this place down there or not. I couldn't say exactly what it was that was said, but they were talking about some will or deed, and one of them asked where Fred was and the other said he was down on the island. I don't know whether it was the one that could walk was the one that was talking about the will or deed or not, but the will or deed was to be made to Fred and his wife. I have never talked to you about this case."
W. L. Roberts, referring to a conversation with the same party, swore: "He said he was thinking about making a will or deed; he talked like he had talked to Col. Martin about it, and wanted me to witness it. He mentioned one thing in particular, he didn't know whether to make a will or a deed to the place; he says, sometimes a man makes a mistake by making a deed, and he talked *Page 648 
on about how he liked to stay with Mrs. Hogan and Fred did, and he said he wanted them to have the place, Mr. and Mrs. Fred Hogan. The only question in his mind was, he didn't know whether to will it to them or make them a deed; he says, sometimes a fellow makes a mistake deeding things away before he dies. . . In that conversation with me he told me that he wanted Mr. and Mrs. Fred Hogan to have this farm. . . Yes, I said that Mr. Fill said that he wanted Mr. and Mrs. Fred Hogan to have the farm; he mentioned the farm, he called it the Durham farm. When I was down there looking at the timber they called that the Durham farm. That was where they lived at that time; he (F. M.) was living at that time."
The testimony of Frank Garland was: "I knew F. M. (Fill) Hogan during his lifetime. . . Yes, I have visited his home, or stopped to get a drink of water. . . While I was there Mr. Hogan discussed some of his business with me. He told me that he heard I had a little lawsuit, or something like that, with reference to a will; and he asked what kind of papers I had to my land, and I told him. As to what he said then, he said he bought that place for Fred and his wife; that was the trade before they bought it and come down there. That is what he told me. He said he was going to give that place to Fred and Mrs. Hogan. . . As to who he said the trade was made with, well, he just told me that he bought the place; that was the trade between him and Fred and his wife. As to when that happened, I forget now the year, 1935 or 1936. It was over a year before he died. . . That was the only time he had a conversation with me. . . Yes, I stated that he said the trade was that they were to take care of him as long as he lived; that was the trade before he bought the place, that they were to take care of him. As to whether or not that was all of the contract, he didn't say anything more about the contract. As to whether or not that is all he told me that they were to take care of him as long as he lived and he would give them the place, he said he bought it for them. He didn't say how or when he would give it to them; he said he bought it for them."
W. P. Cordell testified: "Back in 1936 I worked for D. H. Fuller. I went over on the Hogan farm along about that time. I saw F. M. Hogan, the old gentleman. I was cutting some land *Page 649 
for them with a tractor. I talked to F. M. Hogan while I was there. . . As to whether or not he said anything about the buildings and farm, yes, he told me, according to mine and Fred's contract, at my death the place falls back to Fred. . . He said that the contract between him and Fred was at his death the place fell back to Fred. Yes, that is all he said about the contract. . . He said, `I think Fred and his wife are due this place, they are so good to me.' As to whether or not he said that the contract was between him and Fred and was not between him and Fred and his wife, I don't remember whether he said anything about the contract as to her or not. . . He said that Fred and his wife were entitled to the place, because he said that Fred's wife was so good to him that he felt like the place ought to fall back to him at his death."
C. B. Climer testified as follows: "I knew Mr. F. M. Hogan during the latter part of his lifetime. I have talked to him about the farm down there. One day I was down there buying some cattle from him, and I said something about improving the place, and the building of the barn; and he said, yes he wanted to fix it up for Miss Maudie and the rest of them. . . The only thing I heard Mr. Fill say was that he wanted to fix the place up for Miss Maudie and the rest of them; that is the way he spoke it. As to whether or not he said anything about giving them the place, or anything like that: no, not especially."
Carl Henderson swore: "I lived on some land adjoining Mr. Bill Hogan. At that time F. M. Hogan lived with Fred Hogan and his wife. . . I lived up there until 1930. Along about that time (1930) Mr. Fill Hogan talked to me about buying a farm. He said he was getting very old and not able to work and didn't need the farm for himself, and that he was buying it for Fred so he and his brother, Bill, could have a home with Fred — so he told me. . . The only thing he told me was that he bought the farm so he could have a home with his brother Fred; that is all he said about it. He said he was buying the farm so that he and his brother could have a home; but the way he spoke it, he was buying the farm for Fred so he could have a home with him."
In recalling a conversation with F. M. Hogan, Reece Ellis testified: "I knew Mr. F. M. Hogan during his lifetime, Fred's *Page 650 
uncle. As to whether or not I talked to him down there at that time, well, I talked to Fred, and he was along. . . The purpose of their trip down there where I was, was to get me to cut some land, and I arranged to cut some land. . . The question of who owned the farm came up, and I later talked to Fill Hogan about whose it was; we was down in the field and we were talking about the farm, and I asked him who the farm belonged to, and he says, `Well I bought the farm myself,' but says, `It is Fred's farm at my death; at my death the farm will be Fred's provided' — I think, I don't remember just how he said it — said Fred was supposed to look after him the rest of his life, or give him a home; something like that. He said something about his brother, Fred's father, I think. . . He said he bought it where he would have a home the rest of his days, and I don't remember how he said it, but anyway he bought the farm where him and his brother would have a home the rest of their days. Yes, he said what the contract was as to who was to have the farm; he said Fred was to have the farm at his death. . . I think he said Fred and Maude. . . He just said it was going to Fred and Maude."
A. M. Hopkins testified: "I knew Mr. F. M. Hogan when I lived down at Plainville. . . I went to see him about renting a crop. . . He said he didn't have anything to do with it, that I would have to see Fred. . . I was there in 1933 cooking syrup for him, and I heard Mr. Fill Hogan at that time talking about his farm; he told me that he and Fred had shopped all over North Georgia hunting a place to suit Fred. . . He said why he bought the farm; said he bought it because it suited Fred; that he was buying to suit him. As to whether or not he said anything about what the trade was between him and Fred: no, he didn't say why he had bought it for him or anything, but he just said he bought the one that suited Fred."
Clarence Yarbrough testified: "I have heard Mr. Fill Hogan talk about the farm, what was going to be done with it; he said he was getting up in ages and wasn't able to work, and he went down to buy that farm, and said that he got Mr. Fred to go with him, that he didn't have no family and at his death he aimed for them to have the farm. As to who he meant by `they,' Mr. Fred and his folks, the ones that was seeing after him. Fred's wife and daughter was seeing after him, and sometimes he would have somebody else, some colored girl when they could get somebody." *Page 651 
W. J. Hopkins, relating a conversation with F. M. Hogan, testified: "I says, `Grandpa,' (I always called him Grandpa) `who owns this place, you or Fred?' and he says, `I own it,' and I says `Well, I didn't know; my boy was wanting to trade about making a crop on the place;' and he says, `Anybody that wants to make a trade of that kind with Fred, whatever Fred does in that line is all right.' He says, `I have got the deed to the place, and I have got my crippled brother and me here, and if I have got the place at my death I aim for Fred and Maude to have it.' And one of my boys spoke up and says, `Why don't you make a deed so the trade will stick?' and he says, `I have got two reasons; one is if I go and make a deed, they might say we have got a deed to the place and might not treat me as well.' He says, `I don't know that they would do that, but I have known of it being done. And another reason is, if I deed him the place and I outlive him, I would be out of a home.' . . He said if they continued to treat him and his old crippled brother like they had, that if he had the place at his death he aimed for them to have it."
Bob Tally testified, as to a conversation with F. M. Hogan: "As to whether or not I heard Mr. Hogan (F. M.) say anything about that farm as to what was to become of it; he told me that he gave it to Fred to take care of him the rest of his days; that is what Mr. Fill told me. . . Something was said about Mrs. Hogan in connection with the farm, she was the main one. . . He said he was giving them the farm, or he left that impression on me. . . He said he had given it to them."
John Holbert also testified as to a conversation with him, as follows: "About the only thing I heard Mr. Hogan say, I went there one time to rent some corn land, and he told me Fred was in charge; that he bought that place for Fred and him a place to live, that he couldn't live with any of the rest of them. I mean that he was to have a home there as long as he lived. He told me I would have to see Fred about the distribution of the farm."
Henry Holbert testified: "I heard Mr. Fill Hogan say something about the farm. . . I asked him whose place it was, and he says `It is Fred's. I have left it for Fred. Fred has been good to me and my brother, and I want to be as good to him as he is to me.'"
1. On the former appearance of this case we reversed the judgment for the trial court's refusal to sustain the demurrer to the cross-action of the defendants, and did not consider the assignment of error relating to the refusal to grant a new trial. Brogdon v. Hogan, 189 Ga. 244
(5 S.E.2d 657). Afterward the case was tried again. Amendments were offered; and the demurrer being reurged to the cross-action as amended, the same was overruled. The jury again found in favor of the defendants. A motion for new trial was made, presenting only the insistence that the verdict was contrary to law and to the evidence. This was overruled. Error is assigned on the allowance of the amendments, the refusal to sustain the demurrer, and the denial of the motion for new trial. The amendments cured the defects in the cross-action, unless it was still demurrable on the ground that no definite date of the contract was given. The original petition stated that the agreement relied on was made "in December, 1930." One of the grounds of the original demurrer was that it was not alleged "when and where said alleged agreement was made." Other grounds of demurrer raised the question of the vagueness and the indefinite and uncertain character of the alleged contract. Among other things we ruled that "The petition in the instant case did not with precision give the terms of the contract, or its date." On the second trial an amendment was offered and allowed, which recited: "That their contract, as heretofore alleged with their deceased uncle, F. M. Hogan, was made in the month of December, 1930, the exact dateof the month being unknown to defendants." (Italics ours.) This court did not on the first appearance of the case rule that the mere absence of an allegation as to the particular day in December, 1930, would in and of itself render the pleading demurrable, but only pointed out the lack of precision in setting forth the terms of the contract, and, as a further lack of precision, the absence of a definite date. It is true that as against a special demurrer the petition should allege "the time and place with such precision, certainty and clearness, that the defendant, knowing what he is called upon to answer, may be able to plead a direct and unequivocal defense." Bond v. CentralBank of Georgia, 2 Ga. 92, 100; Warren v. Powell,122 Ga. 4 (49 S.E. 730). However, "This court is not *Page 653 
an expounder of theoretical law, but it administers practical law, and corrects only such errors as have practically wronged the complaining party." Brown v. Atlanta, 66 Ga. 71, 76. One of the reasons for naming a precise date is that if the alleged contract be barred by the statute of limitations, it is only fair that such fact be disclosed. We are not concerned with anything of that kind here. Another reason is, that a date helps to identify and to make certain the particular contract relied on. When on the second trial the defendant in other respects amended his cross-petition and reasserted the month and year when made, and added, "the exact date of the month being unknown to defendant," judgment will not be reversed for the trial court's failure to sustain a demurrer based on the ground that no date was alleged, when on an examination of the record as a whole it is plain that no harm has thereby resulted to the opposite party. Compare Hudgins Contracting Co. v. Redmond, 178 Ga. 317 (4) (173 S.E. 135); Hudson v. Hudson, 90 Ga. 581 (4) (26 S.E. 482); Gordon v. Spellman, 145 Ga. 682 (8) (89 S.E. 749, Ann. Cas. 1918A, 852).
2. As finally amended, the pleadings of the defendants allege the following as the terms of the contract which they assert was entered into between them and the plaintiff's intestate, F. M. Hogan: "That in December, 1930, said F. M. Hogan, in order to have a place to stay and some one to take care of and look after him and his aged brother whom he wanted near him, agreed with these defendants, his nephew F. H. Hogan, and wife Mrs. Maude Hogan, that if they would give up where they were living and would go with him to Gordon County, Georgia, on the property described and make a home for him and his brother W. J. Hogan during their lifetimes, and look after them, cultivate, drain, and improve the property and make it livable and habitable as a home and a farm, he would buy the property for them; that the place was run down at the time, and F. M. Hogan stated that he could not on account of his old age attempt to build it up or manage it, and that if the defendants would make the property livable and build it up and maintain a home for him and his said old and crippled brother and keep them there together, he would purchase the property for them; that under the agreement and contract the legal title to said property was vested in Fred Hogan and Maude Hogan upon the death of F. M. Hogan; that their contract was made in *Page 654 
the month of December, 1930, the exact date of the month being unknown to defendants, and was to be terminated under the terms thereof upon the death of said F. M. Hogan; that under the said agreement and contract the legal title to said property was to be vested in said Fred Hogan and Maude Hogan upon the death of F. M. Hogan by deed or will."
We have, although with some doubt as to the correctness of our conclusion, ruled that the amended allegations with respect to the terms of the contract met the rule that requires it to be so clear that neither party can reasonably misunderstand it. CompareStuder v. Seyer, 69 Ga. 125; Adcock v. Shaw, 167 Ga. 710
(146 S.E. 478); Blumenfeld v. Citizens Bank Trust Co.,168 Ga. 322 (147 S.E. 581). But the burden which the law casts upon one seeking specific performance of an oral contract of this character continues, of course, beyond the pleadings; and as to the proof, the existence of the particular contract must be made out so clearly, strongly, and satisfactory as to leave no reasonable doubt. Printup v. Mitchell, 17 Ga. 558; Gordon
v. Spellman, 148 Ga. 394 (96 S.E. 1006); Lloyd v.Redford, 148 Ga. 575 (97 S.E. 521); Allen v. Allen,151 Ga. 278 (106 S.E. 81); Hattaway v. Dickens, 163 Ga. 755
(137 S.E. 57); McDermott v. Lankenau, 170 Ga. 585
(154 S.E. 149); Ellis v. Reagan, 172 Ga. 181 (157 S.E. 478);Wall v. Wood, 174 Ga. 508 (163 S.E. 153); Pattillo v.Mangum, 176 Ga. 51 (166 S.E. 641).
An examination of all the testimony concerning the making and the existence of a contract discloses conversations with F. M. Hogan in which "he talked about some will or deed" that "was to be made to Fred and his wife;" that he wanted them to have the place, "but he didn't know whether to make a will or deed to the place;" that he bought the place for them, and "was going to give that place to Fred and Mrs. Hogan;" "he [F. M. Hogan] said the trade was that they were to take care of him as long as he lived."He didn't say anything more about the contract;" he said, "according to mine and Fred's contract, at my death the place falls back to Fred;" also that "Fred and his wife were entitled to the place, because he said that Fred's wife was so good to him that he felt like the place ought to fall back to him at his death;" that he wanted to "fix the place up for Miss Maudie and the rest of them;" that he was buying the farm "for Fred, so he and his *Page 655 
brother Bill could have a home with Fred;" that he said "it is Fred's farm at my death. . . I think he said Fred and Maude." Soon after moving on the farm, F. M. Hogan told a witness "that he got Mr. Fred to go with him . . and at his death he aimed for them to have the farm; that "if they [Fred and his wife] continued to treat him and his old crippled brother like they had, that if he had the place at his death he aimed for them to have it." To another witness, "he said he had given it to them." To another he said the place "is Fred's."
Let us summarize the allegations of the petition as to what the contract was, and the testimony. The original allegations were that F. M. Hogan contracted with F. H. Hogan and Mrs. Maude Hogan that upon their performing certain obligations he would purchase the property for them. By an amendment it was alleged that title to the property was to be vested in Fred Hogan [F. H. Hogan] and Maude Hogan upon the death of F. M. Hogan. By another amendment its date was given as some unknown day in December, 1930, and that it was to be terminated upon the death of F. M. Hogan. By a third amendment it was alleged that the title to the property was to be vested in said Fred Hogan and Maude Hogan upon the death of F. M. Hogan, by deed or will. The defendants sought to prove their case by declarations made by F. M. Hogan. The witness Fowler testified that he was talking about a will or deed that was to be made to Fred and his wife. Roberts testified that F. M. Hogan said he was thinking about making a will or deed; that he wanted Mr. and Mrs. Fred Hogan to have the place. Climer testified to a conversation in which he said he wanted to fix up the place for Miss Maudie and the rest of them. Henderson testified that he said he was buying the farm for Fred so he and his brother could have a home with him, and that it was to be Fred's at his death. A. M. Hopkins testified that he said he bought the farm because it suited Fred. Yarbrough testified that he went down to that farm, and that he got Fred to go with him, and that at his death he aimed for them to have the farm; that is, Mr. Fred and his folks, the ones that were seeing after him. W. J. Hopkins testified that F. M. Hogan told him that if Fred and his wife continued to treat him and his brother like they had, if he had the place at his death he aimed for them to have it. Tally swore that he told him he had given it to Fred to take care of him *Page 656 
the rest of his days, and that in this connection something was said about Mrs. Hogan. John Holbert testified that F. M. Hogan told him that he had bought the place as a place for Fred and him to live on, that he was going to have a home there as long as he lived. Henry Holbert testified that he asked Mr. Fill [F. M.] Hogan whose place it was, and that he said it was Fred's; that he had left it for Fred.
None of the testimony referred to above, or all of it put together, proved any contract between F. M. Hogan and the defendants. The only portion of the proof that came anywhere near striking distance of the contract which is alleged in the pleadings is the testimony of Garland, Cordell, and Ellis, the material portions of which are given in the statement preceding this opinion. Garland in effect swore that F. M. Hogan stated to him that he bought for Fred and his wife; that that was the trade between him and Fred and his wife before he bought it; that he was going to give it to Fred and his wife; that the trade was that they were to take care of him as long as he lived. This did not prove the contract declared on. It left out all reference to a material part of the reciprocal agreement which defendants allege they entered into with F. M. Hogan, to wit, to make a home also for W. J. Hogan during his lifetime, and to look after him also. Cordell, in testifying to a conversation, swore that F. M. Hogan told him that "according to mine and Fred's contract, at my death the place falls back to Fred;" but this does not describe the terms of any contract. It refers to a contract, but does not state what it was, except to state that according to the contract at his death the property falls to Fred. Whether conditionally, or unconditionally, and, if conditionally, what those conditions were, we do not know. What reciprocal obligations there were on Fred's part, if any, are not given; and finally, the witness's testimony was that the place was finally to pass to Fred, not to Fred and his wife, as the cross-action alleges the contract to have provided. The third witness to speak of a contract was Reece Ellis. His testimony is vague and uncertain. Reading it one can not be certain whether he represents F. M. Hogan as declaring that Fred was to look after him alone or his brother also; whether at his death Fred was to have the farm, or Fred and his wife. As before pointed out, the law requires that this kind of a contract must be established so clearly, strongly, and *Page 657 
satisfactorily as to leave no reasonable doubt as to the contract. As was said in Russell v. Switzer, 63 Ga. 711,725, "declarations are no substitute for a last will and testament." In that case this court in the opinion dealt with a number of decisions from other jurisdictions concerning the necessity for fullness and certainty of the evidence by which a suit of this character must be maintained, and said that the decisions referred to "inculcate a wholesome caution against building up imaginary contracts out of the expression of generous intentions towards persons who, having rendered service, prefer claims for compensation after those whom they served have been removed by death." In the same opinion this court, speaking through Bleckley, Justice, observed: "The domestic affections delight in being bountiful both in rendering service and in rewarding it, and not unfrequently they express themselves in terms of liberality far beyond the measure of any obligation which, as matter of contract, they would be willing to assume. Much of the pleasure of exercising them would be lost if their generous promptings were in danger of being trammeled with the bonds of legal duty. There is need for tribunals to be on their guard against extracting legal obligations out of acts or expressions of parental kindness." Notwithstanding there have been two concurrent verdicts on an issue of fact submitted to the jury, if the finding be clearly against law, the verdict will be set aside and a new trial granted. Chambers v. Collier,4 Ga. 193; Trustees of Monroe Female University v.Broadfield, 30 Ga. 1. There have been here two verdicts for the same parties, each of which has received the approval of the trial judge; but this is a court for the correction of errors of law, and it is an error of law to refuse to grant even a second new trial when the verdict is not supported by the evidence. We have reached the conclusion that this verdict can not stand, for the reason that the contract alleged in the cross-action has not been proved with that degree of certainty and definiteness required by our law. Since this is true, we need not deal with that part of the evidence touching the question whether or not the defendants have discharged the obligations resting upon them under the alleged agreement.
Judgment reversed. All the Justices concur, except Bell andJenkins, JJ., who dissent.