1. A contract under which one of the contracting parties agrees with the other, for a valuable consideration, that he will make a will giving to the other property, either real or personal, is enforceable in equity, but specific performance will not be granted unless strictly equitable and just. Mere inadequacy of price may justify a court in refusing to decree a specific performance, as well as any other fact showing the contract to be unfair, or unjust, or against good conscience, and to authorize the relief sought the terms of the contract must be clear, distinct, and definite.
(a) The petition as amended, seeking specific performance of an alleged oral contract between the petitioner and the defendant administrators' intestate, whereby in consideration of specified services to be rendered by the petitioner to the intestate the latter promised to make a will leaving to the petitioner all of his property, and setting forth full performance by the petitioner of the agreement and a breach by the intestate, was not subject to the general grounds of the defendants' demurrer.
(b) The special grounds of demurrer are without merit.
2. The evidence was sufficient to prove, with the degree of certainty required by the law, the alleged parol agreement by the defendant administrators' intestate that, if the petitioner would render described services to him during his lifetime, he would execute a will leaving all of his property to the petitioner, and that the petitioner fully performed his part of the agreement breached by the intestate.
3. The charge of the court that the petitioner was incompetent to testify in the case was a correct and applicable principle of law, the only issue being as to an alleged contract between him and the intestate and compliance therewith, and was not harmful or confusing to the jury or erroneous for any reason.
(a) The charge of the court that the testimony of an unimpeached witness, where there is no other testimony or evidence in conflict with his, can not arbitrarily be disregarded, stated a correct and applicable principle of law. The rule does not mean that the jury are obliged to believe testimony which under the facts and circumstances they discredit, but means that they are to consider the testimony of every witness who is sworn and not arbitrarily disregard the testimony of any witness. The court was not obliged to charge as to the impeachment of witnesses where no request was made, and if any additional instruction was desired a proper written request should have been made.
(b) The charge of the court that "the fairness of a contract is usually to be determined as of its date, and the happening of subsequent events within the reasonable contemplation of the parties does not afford a defense," stated a principle of law pertinent and applicable to the facts of the present case.
(c) The refusal to admit in evidence a certain document — purporting to be an original or copy of a written appearance and claim filed in the court of ordinary by two alleged nearest kin of the intestate, through two named attorneys, in the matter of his estate, but being neither sworn *Page 550 
to nor certified, and not admissible in evidence for any purpose — was not error.
 No. 15639. NOVEMBER 14, 1946.
George N. Blanos filed on June 25, 1945, in the Superior Court of Richmond County, Georgia, an equitable petition against H. T. Matthews and John D. Curtis, as administrators of the estate of Peter Yeakes, deceased, the petition as amended alleging the following: (a) Peter Yeakes came to this country more than thirty years ago from Greece and settled at Thomson, Georgia, where he operated a restaurant. He was never married and did not have any family in this country, and so far as the petitioner knows he did not have any relatives in Greece at the time of his death. (b) The petitioner and Yeakes became friends about thirteen years ago; there was a very close personal and affectionate relationship between them; and after Yeakes moved to Augusta, Georgia, in December, 1941, he and the petitioner were constantly together and were very devoted to each other, and Yeakes confided in the petitioner all of his personal and business affairs and sought advice and counsel from him in all matters pertaining to his personal and business affairs. The petitioner is of Greek descent, and the relationship existing between him and Yeakes was in effect that of father and son, and Yeakes referred to the petitioner as his son. (c) This close personal, confidential relationship continued to exist between them, and on or around May 1, 1942, Yeakes agreed with the petitioner that, if the petitioner would continue to render the affectionate and considerate attention to him as he had in the past, in looking after his welfare, comfort and health, and in visiting him and rendering to him the petitioner's personal aid and services in and about his private life, to act as a companion, to look after and care for him during any illness, and during his old age, and help him manage his finances, to make investments, help him in running a restaurant business known as "Buddy's Place" by buying supplies for the restaurant, to pick up orders and relieve him from duty in the restaurant from time to time, to keep books and to make income, social security and O. P. A. reports, help him in securing labor for the operation of the restaurant business, help with banking, paying bills, and help him in conducting his business affairs *Page 551 
generally until his death, he would make a will devising to the petitioner all of his property of every kind and nature wherever situated. (d) The petitioner fully complied with the agreement above set out, in that he made investigations for Yeakes in connection with investments, and advised and counseled him generally in connection with his business and personal affairs. He helped Yeakes in the operation of a restaurant known as "Buddy's Place," ordered groceries, and would on numerous occasions go out and pick up the groceries and bring them in to the restaurant. He helped to secure labor for the operation of the said restaurant, and would act as cashier to relieve Yeakes when he would desire to be away from the restaurant. The petitioner kept the books, took care of the banking, and paid bills, made income, social security, and O. P. A. reports. He acted as secretary to Yeakes in the handling of all his correspondence, performed every service required of him by Yeakes, and these services were continuous over a period of two years or more previous to the death of Yeakes. For a period of three to four weeks in 1942 Yeakes was confined in a hospital, and in addition to looking after the business affairs as above enumerated, the petitioner made all preparations for getting Yeakes into the hospital and made one to two calls per day to the hospital to determine his condition. The petitioner secured doctors, paid bills, and upon the return of Yeakes from the hospital to his home the petitioner made appointments with doctors and carried him to and from the doctors' offices for several months afterwards, all in accordance with the agreement entered into with him. The petitioner personally administered to Yeakes in every request that Yeakes made of him. He was a true and confidential companion and was with Yeakes at all times of the day and night when it was possible for him to serve him in any way, and he spent many hours visiting Yeakes and trying in every way to contribute to his pleasure and welfare, as much as if Yeakes had been his own father, and continued to take this interest in him until his death. (e) After the petitioner had complied fully with all the terms of the agreement aforesaid, Yeakes died intestate without having made a will devising his property to the petitioner. (f) At the time the said agreement was entered into, Yeakes was 57 years of age and had an expectancy of many more years to live. (g) Due to the close affectionate relationship existing between them and the kind and considerate attention *Page 552 
rendered to Yeakes by the petitioner in looking after his welfare, comfort and health, and in caring for him during periods of illness, the value of the petitioner's services can not be calculated in money. In so far as the services rendered in advising and helping him in his business are concerned, the petitioner says that such services were worth at least $2000 per year. (h) The estate of Yeakes, after the payment of all debts, will amount to approximately $25,000.
The prayers were: that the defendants be required to specifically perform the contract heretofore entered into between the petitioner and Yeakes, and that the petitioner be declared to be the sole owner of all the property left by Yeakes at the time of his death, subject to the payment of debts and the expenses of his last illness and expenses of administration; that the petitioner have judgment against the defendants for all funds in their hands after payment of the aforesaid items; that the title to all property in their hands be directed to be in the petitioner; and for process.
The defendants demurred generally to the petition as amended on the following renewed and additional grounds: 1. The petition does not set forth any cause of action legal or equitable against the defendants. 2. The petition does not set forth any cause of action because the allegations of the petition as a whole fail to set forth any grounds in law or equity on which the petitioner is entitled to the relief prayed for. 3. The petition does not set forth a cause of action in law or equity because the contract relied upon is not set forth so clearly and satisfactorily as to leave no reasonable doubt as to what the contract was. 4. The petition does not set forth a cause of action in law or equity in that it fails to allege the date of the alleged contract, the value of the services rendered by the petitioner to the deceased, or the value of the property the petitioner was to receive under the agreement, so as to enable the court to determine the adequacy of the consideration therefor or the justness or fairness of the contract. 5. The petition does not set forth any cause of action because it appears from the petition that at the time of his death on May 11, 1944, the deceased was a resident of McDuffie County, Georgia, and the defendants qualified as administrators in the court of ordinary of that county; and that the contract sought to be enforced, as it appears from the petition, was entered into by the deceased and the petitioner on or around May *Page 553 
1, 1943, and Yeakes died on May 11, 1944, and it would be inequitable and unfair to set aside an estate of the value of $25,000, as alleged in the petition, for one year's service rendered by the petitioner to the deceased, when the petitioner alleges that his services were worth only at least $2000 per year. 6. The petition does not set forth a cause of action because it is an effort on the part of the petitioner to establish a will devising all of the deceased's property to himself, as it appears from the petition that the petitioner's services were worth $2000 per year, such services were rendered for one year, and the estate is worth $25,000, as alleged. 7. The petition does not set forth a cause of action because at the time of his death Yeakes was a resident of McDuffie County, Georgia, the contract was alleged to have been made on May 1, 1943, and he died on May 11, 1944, and the value of the petitioner's services are alleged to be only $2000 per year, whereas the petition endeavors to obtain the entire estate of $25,000. The defendants demurred specially as follows: 1. The allegations of paragraph (a) are conclusions on the part of the pleader and are immaterial, because whether Yeakes left any relatives at the time of his death is immaterial, and, if he did not, the property would escheat to the State, and under the Code, § 85-1104, the proceeds of the property would be paid to the Treasurer of McDuffie County, Georgia, for the educational fund of that county. 2. The allegations of paragraph (b) are irrelevant and immaterial to the issues in this case, because the question is whether there was a contract between Yeakes and the petitioner, and their personal relations had absolutely nothing to do with the contract relations. 3. The facts set up in paragraph (c) do not constitute a contract between Yeakes and the petitioner, but show voluntary services of a minor character rendered by the petitioner to Yeakes. 4. In paragraph (d) no facts are set up showing other than friendly personal services to Yeakes by the petitioner, and no facts are shown constituting a business agreement or an agreement to convey the property in question.
The court overruled the demurrers, and the defendants filed exceptions pendente lite duly certified.
Thereafter the case came on for trial and evidence was introduced substantially as follows: Jim Gorgwitch testified: While he came from Jugoslavia many years ago, he spoke Greek, had been associated with Greeks most of the time in this country, and was *Page 554 
generally regarded as a Greek. He did not know Peter Yeakes until Yeakes removed from Thomson, Georgia, to Augusta, Georgia, about two and a half years previously. They worked together in the Famous Grill in Augusta, and later became partners in a restaurant which Yeakes opened and so continued for about two years until the death of Yeakes. With reference to assistance rendered by George Blanos, he testified: That Blanos "was doing everything supposed to do in that restaurant. I heard a lot of times conversation between Peter Yeakes and George Blanos about agreement that they entered into. That agreement was long before I know George Blanos. On the same time when I got with Pete he told me that. He said: "George is my boy. I like that boy and I am going to do everything I can for him.' I heard a conversation between George and Peter. It was this: He asked George, if he find a girl to get married, he buy him a home, buy him furniture, buy him everything he wants. As to any agreement he had, really I have never seen the writing or anything, but I heard it right between them two. I heard them talking, George and Pete. Pete Yeakes said. `If George needs anything he wants, to give it to him, and if he find a wife to get married, he buy him home or buy him furniture, buy him everything.' On the same time I told him, I said, `Partner, you know George got a mother and father.' He said, `I like the boy and I do anything I can for him as long as I like him.' I started with Pete about two years before his death, and George was around there and doing things for Peter then. He used to use his own car to buy him meat and buy him stuff and buy him everything he want, because he was old man and he couldn't run around and buy stuff until I come in. After I come in — everybody knows it — after I came in, partner with him, I was doing all that work and George was there helping me. . . I ain't got no education, and Pete he ain't got no education, so we had George to buy us all our book work, all our buying, all our social security, income tax, everything was supposed to do. We used to give money to George, and George pays bills for us and things of that kind. George kept the books and looked after Peter, and when he was sick he was taking care of the place. I really don't know why George did all that, but he told him all that. He liked the boy and he was doing that. He was doing all that because that was the agreement George and Pete had. I did not hear that agreement when it was made, *Page 555 
but heard it afterwards from both of them, and they were together when they talked about it, all talking there, and he said that lots of times, said, any time Pete died, Peter Yeakes said this, and he told me that was the agreement. He told me once or twice in George's presence that he ain't got nobody or a home and he ain't got nobody in this world, and he might as well leave it to George as anybody he knows. He told me, he said, `I ain't got no wife, no daughters, no sons or nobody,' and he said, `Everything I got I am going to leave to George.' . . The agreement between Peter Yeakes and George was, as I said, if anything happen to Peter Yeakes, George take care of him. In other words, George was to take care of Peter. As I have supposed to do, to look after his business and all he got, to take care of him, look after all his business. That's all I know what there was. But I don't know what more he can do. He left his own father's place and come up to do our job. He was everything we need there. He was to get it for us. He was, you know, when those points come out. We can't do that ourselves, and he used to leave his own office and mother's and father's place and go get it for us. All social security and all book work and all income tax, everything was paid by him. He take the money and pay for us. We didn't know a thing about it. He was there every day and night, and when he got sick he was in the hospital. I was taking care of the place and he used to come up and help me. Any time I needed help he come and get us in his car." The witness further testified: that Blanos was doing all these things because he promised Peter Yeakes to do so, and that Yeakes promised Blanos to take care of him as long as he lived, and after Yeakes died to give him everything he had; that on the afternoon of his death, while waiting for an ambulance to take him to a hospital, Yeakes said, "If anything happen to me, I leave everything I got, bonds and money, property, everything I got, to George;" that at that time in the restaurant Yeakes pointed to the witness by the cash register and said, "There's money there and the bills, stuff I paid bills out of the drawer," and "That is yours and take care of it." He further testified: "When I get in there, we don't have no kind of a contract or agreement, and when I left there we don't have no kind of agreement or no kind of a contract made. What was there between me and Pete Yeakes and George Blanos, we never make any agreement, but we believe to each other. *Page 556 
That is the way we done. I don't know whether Peter Yeakes was married or not. I don't know a thing about him. I discussed his family with him, and he told me he had never been married. He said he don't have any children. He don't have nobody in the old country, that he don't have nobody in this world, and I tell you how that was." The witness then related that Yeakes bought some war bonds, and that the witness bought some and made Yeakes the beneficiary therein. He further testified: "Mr. Blanos did all the work up there, social security and all, and I tell you he was paid for it but not properly. You know what I mean. Now any time he needed anything he come to us and we always give it to him. He would take what we gave him and go on, and don't want nobody to work for nothing for us. You know five or ten dollars. He come to me or the old man, five or ten dollars. I don't think that is any pay. I didn't offer to pay him any more. Pete and I didn't pay him for all the work he did, not all the work. You know yourself you can't find anybody to do that for that little bit of money we pay him. I don't say he complained or not, but never heard him. Every time he needed from me I always gave it to him. I was in business there with Pete pretty near two years. When I got there George Blanos was right with him. George Blanos was his lawyer from the time I got there and before that, and he filled out the income tax returns before I got there. After I got there he was right there every minute. . . He was not getting money for filling out the income tax returns. . . I was giving him that. For the social security I was giving him that. I didn't see Pete give him anything. I was running the store up there with Pete. I paid him and Pete never did pay him and I never did see him pay anything. I paid him my part for the income tax work. . . This contract was made between Pete and George Blanos before I got there. . . Pete died May 11, 1944, and I got there pretty near two years before that. This contract was made before that. Before 1942. . . I don't know whether it was in writing or not. What he told me is all I know. He told me that at the time I got in partnership with him. I believe it was in 1942, Yes. . . As to the terms of that agreement, as I said before, George had been nice to him and taking care of him and he leave everything to him if anything happen to Pete Yeakes. . . When he was dying he said, I was to get the cash in the cash register because he didn't *Page 557 
pay me that agreement I had when I left there. . . We did not pay George any salary, no wages and no salary. He paid our bills. Both of us gave him the money to pay the bills. . . When we gave George money he would bring back receipts. . . George was not on the payroll of our place. I don't know how much it would be worth a year for George to do all that he did for Pete. I can't very well estimate that. I tell you, as a man myself, uneducated man, he was worth a lots to us. By the year I believe it would be worth a thousand apiece. By `apiece' I mean each of us. In other words, I put a valuation of about two thousand dollars a year. Peter Yeakes was 59 at the time of his death. . . I never see Peter pay George anything for what he did. I don't pay him for real what they was to pay. . . I never paid him anything regularly, no definite amount. . . I haven't promised to pay him anything. I don't feel like I owe him anything. The promise was on Pete's part."
Dr. William J. Cranston testified: He was called to administer to Yeakes at his restaurant on May 11, 1944. Yeakes had recently suffered an acute attack of a coronary disease and was in great pain, critically ill, and died within five minutes after being placed in a room at a hospital. The witness knew Jim Gorgwitch. He saw him at the restaurant and he and Yeakes were talking in a tongue unknown to the witness. Yeakes pointed to the cash register and various objects in the cafe. This took place while they were waiting for the ambulance to take Yeakes to the hospital. The witness had treated Yeakes on previous occasions. Blanos would generally bring him to the office and would make arrangements for Yeakes to come and see the witness, though Yeakes would occasionally come by himself.
W. A. Ansley testified that he knew Yeakes from the time Yeakes went to Thomson until his death. Yeakes used to think quite a lot of the witness' two little girls who are now grown and one of whom is married. Yeakes was a very popular fellow in Thomson. After he had had a serious illness in an Augusta hospital in December, 1943, and had returned to his place of business, the witness had a conversation with him there and said: "Pete, my daughter was thinking about you the other day when you were so sick, and wondered if you had made any different plans." Yeakes used to tell the children, who purchased hot-dogs or hamburgers at his place *Page 558 
of business in Thomson, that when he died he was going to leave them his estate so they could keep the grave swept off and flowers on it, and the younger daughter said, she reckoned Peter had changed his plans. Yeakes said to the witness: "One of your daughters is already married and away, and I reckon the other one will be married and will go away, and looks like I'm going to have to leave it to George Blanos." Blanos was there at that time, the conversation taking place in Yeakes' restaurant on Broad Street in Augusta. Yeakes said that Blanos had been so very kind to him while he was in the hospital, and that he was kind of his chief adviser and was taking mighty good care of him. The witness heard Yeakes state that he did not have any relatives.
Dr. R. Lee Olive testified: That he saw a great deal of Yeakes after Yeakes moved to Augusta. He heard Yeakes express his high regard for Blanos and his confidence in Blanos, and on one occasion Yeakes told him he was figuring on going in business and that Blanos was his lawyer, but the witness did not recall anything definite in the way of remarks about Blanos, to whom he usually referred as "my boy."
J. G. McManus testified: That he saw Yeakes at his place of business on the afternoon when Yeakes was taken to the hospital and died, and described his condition at that time. He had had conversations with Yeakes and Yeakes repeatedly said, that Blanos was his boy and he was going to look after him, a mighty fine boy. Blanos was bookkeeper at the lunchroom, the witness imagined, looked after all Yeakes' business as far as the witness could see, paid the bills, and made all returns. Yeakes told the witness that Blanos attended to all his business. Blanos was in the place of business sometimes one or two times a day, sometimes more. He bought the stuff, odds and ends, that went in the restaurant.
L. E. Markwalter testified that he knew Yeakes. The witness operated Buddy's Place on Board Street in 1944, and Yeakes had a lunchroom in there. The witness called the ambulance that took Yeakes to the hospital on the afternoon of his death. He observed Yeakes and Jim Gorgwitch in conversation in the restaurant, Yeakes appearing to be pointing to the cash register. The witness saw Blanos around but not every day. He was there pretty frequently, and the witness thought that he kept the books for Yeakes, paid his income tax, and helped around the place. He was *Page 559 
always keeping the bills up for Yeakes and kept the books and records of the business.
George Bennett testified that he was present in the restaurant and observed the condition of Yeakes before being taken to the hospital where he died, and that Jim Gorgwitch came in and he and Yeakes held a conversation in a foreign language which the witness could not understand. The witness saw Blanos quite often. Blanos would come to the restaurant, and he and Yeakes would visit with each other. The witness understood that Blanos was taking care of the business.
Sylvester Murray testified that he was present when Yeakes was taken sick, and Yeakes requested him to get Blanos. The witness was unable to locate him, but Blanos came in after a few minutes. The witness saw Blanos in the restaurant three or four times a day, practically every morning. Blanos kept the books and looked after the business. Yeakes said that Blanos had the business in charge and looked after him and this business.
John D. Curtis testified that he formerly lived in Thomson and knew Yeakes there, but did not have any knowledge of a contract between Yeakes and George Blanos.
H. T. Matthews testified that he knew Yeakes well, and that Yeakes discussed his business affairs with him and talked to him the day before his death, but did not mention any contract with Blanos.
The following colloquy took place before the court charged the jury: Mr. Harris: "Your Honor, one thing I would like to call the court's attention to before your charge. In these kind of cases the plaintiff, as the court understands, is not a competent witness to testify to any transactions or communications with the deceased, the man whose estate is involved here, and we think in this kind of situation it is fair to charge that to the jury, so they will understand why the plaintiff does not testify, because under the law he is not permitted to testify." Mr. Bussey: "That is correct, but I don't think the court should charge anything on it. It is just like any other incompetent witness." Mr. Harris: "In these peculiar situations the jury does not always know that, and they might not know why." The Court: "Well, I will charge you, gentlemen of the jury, that he is not a competent witness, and that he is not allowed to testify." *Page 560 
The jury returned a verdict in favor of the plaintiff. The defendants filed a motion for new trial on the usual general grounds, and by amendment added the following special grounds: The first special ground complains of the charge of the court: "Well, I will charge you, gentlemen of the jury, that he [Blanos] is not a competent witness, and that he is not allowed to testify;" it being contended that it was erroneous and injurious because, (a) it was confusing to the jury, in that Blanos was not incompetent to testify as to transactions or communications, not in his own favor, by the deceased Yeakes with him or any other person, and the charge as given gave the jury the impression that Blanos was not a competent witness in any manner; (b) it was misleading to the jury for the same reason; (c) it was not sound as an abstract principle of law.
The second special ground complains of the charge of the court: "I charge you, gentlemen of the jury, that where a witness is unimpeached, and there is no other testimony or evidence given in conflict with his, the witness' testimony can not in any case be arbitrarily disregarded, and it is the jury's duty to consider and decide the issue in accordance therewith." It is contended that the excerpt referred to the testimony of Jim Gorgwitch, as he was the only one who testified in reference to the purported contract between Yeakes and Blanos, and it was erroneous and injurious to the defendants because, (a) it was misleading to the jury in that it practically charged them that the testimony of Jim Gorgwitch was to be believed by them; (b) it gave the jury the impression that his testimony was unimpeached, whereas the jury had the right to consider the manner in which he testified and discrepancies in his testimony, and because it appeared that his testimony was equivocal, in that he testified: "I heard a conversation between George and Peter. It was this: He asked George, if he find a girl to get married, he buy him a home, buy him furniture, buy him everything he wants. As to any agreement he had, really I never seen the writing or anything, but I heard it right between them two. I heard them talking, George and Peter. Pete Yeakes said, `If George need anything he wants, he give it to him, and if he finds a wife to get married, he buy him home or buy him furniture, buy him everything.' On the same time I told him, I said, *Page 561 
`Partner, you know George got a mother and father.' He said, `I like the boy and I do anything I can for him as long as I like him;'" (c) that the charge was not sound as an abstract principle of law.
The third special ground complains of the charge of the court, as follows: "I charge you, gentlemen of the jury, that the fairness of a contract is usually to be determined as of its date, and the happening of subsequent events within the reasonable contemplation of the parties does not afford a defense." It is contended that the charge was erroneous and injurious to the movants because, (a) it was misleading and prejudicial to them because it was an expression of opinion by the court that the contract had been established, and that the time thereof was established by the evidence, because the court said, "The fairness of a contract is usually to be determined as of its date," when as a matter of fact the contract had not been established, nor had its date been established. The only witness testifying as to the terms of the alleged contract was James Gorgwitch, who affirmatively swore as follows: "This contract was made before that — before 1942 — I really don't know whether it was made before 1941;" (b) the charge was not sound as an abstract principle of law.
The fourth special ground complains that the court erred in excluding a certain document, uncertified and not sworn to, tendered by the defendants, and consisting of a written appearance and claim filed in the Court of Ordinary of McDuffie County, Georgia, by John George Yeakes, as brother of Peter Yeakes, and George Kastanis, as nephew of Peter Yeakes, through two named attorneys, in the matter of the estate of Peter Yeakes, in which they alleged that they were the two closest of kin and heirs at law of the said Peter Yeakes, that they were citizens and residents of the country of Greece, and claimed the entire estate as such closest and nearest of kin and heirs at law of Peter Yeakes. It is contended that the exclusion of such document was illegal because it would have benefited the movants, and its exclusion was harmful and prejudicial to them in that it tended to show that Peter Yeakes did have close relatives who would inherit his estate, and that the case was not simply a question whether the jury would give the entire estate of $25,000 to George Blanos, or let it escheat to the State as provided by law. *Page 562 
The court overruled the motion for new trial, and error is assigned on such judgment and on the exceptions pendente lite to the judgment overruling the defendants' demurrers.
1. "Contracts under which one of the contracting parties agrees with the other, for a valuable consideration, that he will make a will giving to the other property, either real or personal, have been sustained and enforced in America from the earliest times, and the validity of such contracts seems now to be beyond all doubt."Banks v. Howard, 117 Ga. 94, 96 (43 S.E. 438). However, "specific performance is not a remedy which either party can demand as a matter of absolute right, and will not in any given case be granted unless strictly equitable and just. Mere inadequacy of price may justify a court in refusing to decree a specific performance of a contract of bargain and sale; so also may any other fact showing the contract to be unfair, or unjust, or against good conscience. And in order to authorize specific performance of a contract, its terms must be clear, distinct, and definite." Shropshire v. Rainey, 150 Ga. 566 (2) (104 S.E. 414); Huggins v. Meriweather, 177 Ga. 461 (1) (170 S.E. 483); Whitehead v. Dillard, 178 Ga. 714, 717
(174 S.E. 244); Johns v. Nix, 196 Ga. 417 (26 S.E.2d 526). The petition must allege the value of the services to be rendered and the value of the property, so as to show that the contract sought to be enforced is one not unfair or unjust or against good conscience. Potts v. Mathis, 149 Ga. 367 (100 S.E. 110);Brogdon v. Hogan, 189 Ga. 244, 249 (5 S.E.2d 657). There must be a sufficient specification of the items of service, or else the petition is demurrable. Lansdell v. Lansdell,144 Ga. 571 (87 S.E. 782). "The fairness of a contract is usually to be determined as of its date, and the happening of subsequent events within the reasonable contemplation of the parties does not afford a defense." Whitehead v. Dillard, 178 Ga. 714,717 (174 S.E. 244).
Tested by the above-stated principles of law, the petition as amended set forth a cause of action for specific performance. It alleged historically that the petitioner and the deceased were close *Page 563 
personal and devoted friends of many-years' standing, the relationship between them, after Yeakes moved from Thomson to Augusta, being in effect like that of father and son, and both being of Greek descent. On or about May 1, 1942, Yeakes agreed with the petitioner that, if the petitioner would render him described and detailed services, care and attention, and assist in the operation of a named restaurant of the deceased in the ways and manner detailed in the petition, Yeakes would make a will leaving to the petitioner all his property of every kind wherever situated. The petition then alleges that the petitioner fully complied with the agreement and details the particulars of such compliance, all of which correspond with the specification of services as called for by the alleged contract. The petition further alleges the failure of Yeakes to make the will as promised. It shows the value of the services of the petitioner in and about the business of the deceased as being at least $2000 per year, and alleges that the petitioner's services in looking after Yeakes' welfare, comfort and health, and caring for him in his periods of illness were incalculable in money. The estate of Yeakes, after the payment of all debts, was alleged to be approximately $25,000. Since the petition alleges that at the time the agreement was entered into Yeakes was 57 years of age, it will be found by consulting the Carlisle mortality tables found in the appendix to 70 Georgia Reports that he had a life expectancy of 16.21 years. Rendering services for such period at the alleged value of $2000 and more per annum would amount to a benefit of more than $25,000, the alleged value of the estate. When thus tested by the life expectancy of Yeakes, as is proper under Patrick v. Holliday, 200 Ga. 259 (36 S.E.2d 769), the relation of the value of the alleged services to the value of the estate is shown to be fair and equitable, and the contract would not be unenforceable merely because Yeakes might not have lived to the full extent of his expectancy. The general grounds of demurrer are without merit.
All grounds of special demurrer are without merit.
2. In making proof of an alleged contract under which specific performance is sought, the petitioner has the burden of showing the precise contract, not by a mere preponderance of the evidence, but beyond a reasonable doubt. Printup v. Mitchell,17 Ga. 558 (63 Am. D. 258); Scott v. Williams, 167 Ga. 386
(145 S.E. 651); *Page 564 McDermott v. Lankenau, 170 Ga. 585 (154 S.E. 149);Brogdon v. Hogan, 191 Ga. 647, 654 (13 S.E.2d 666), and cit. As was said in Salmon v. McCrary, 197 Ga. 281, 285
(29 S.E.2d 58): "While the rule may be said to be a strict or harsh one, it is rightly so. Let it be remembered that one who seeks specific performance of an alleged oral contract as against the estate of a decedent is, in effect, asking that property which would otherwise descend by inheritance, as fixed by the law, or by will as determined by the owner, be decreed to be in him. The law quite properly favors the disposition of property through the channels it has prescribed, and requires strict proof to divert it from those channels. When one dies, and is thus no longer able to manage his own estate, the law undertakes to stand as guardian for it and to see that it is legally disposed of, either to his heirs at law or to his legatees under a will as the case requires. In such confidence we live and die, protected by the safeguards established by the law." Besides establishing the contract, the person seeking specific performance must also show a substantial compliance with his part of the agreement. Lee v.Lee, 191 Ga. 728 (1) (13 S.E.2d 774); Christopher v.Whitmire, 199 Ga. 280 (34 S.E.2d 100). Notwithstanding the fact that the verdict of the jury in favor of the petitioner must rest chiefly upon the testimony of Jim Gorgwitch, an uneducated Jugoslavian, such testimony and all reasonable inferences therefrom authorized the jury to find that the alleged contract had been shown with the requisite certainty demanded by the law, and that the petitioner had fully complied with that agreement. This witness became a partner with Yeakes in the operation of a restaurant about two years before the death of the latter on May 11, 1944. His testimony, properly construed, authorized the jury to find that the contract was entered into in May, 1942. He was not present when it was made, but his testimony, though delivered in the language of an unlettered man and somewhat disjointed, was positive and unequivocal that, about the time he became a partner with Yeakes in 1942, and on several occasions thereafter, he heard Yeakes and Blanos, the petitioner, reaffirm and discuss the agreement which is relied upon and which the witness fixed as being in May, 1942. It was not necessary that the precise day of the month of May, 1942, be shown. No question of the statute of limitations is here involved, *Page 565 
nor are we concerned with any consideration which would make the absence of the day of the month of May, 1942, harmful to the defendant. When the somewhat disconnected testimony of the uneducated friend and partner of Yeakes is considered in its entirety, it can not be said that the contract as alleged was not clearly established beyond a reasonable doubt or that compliance on his part was not shown by the petitioner. The testimony of Gorgwitch speaks for itself, and a detailed analysis even of its substance would unduly prolong this opinion. Suffice it to say that he detailed the agreement as reaffirmed in his presence by the parties and the manifold services rendered by the petitioner, testifying that these services were those that, as he gained from the parties, Blanos promised to render to Yeakes and in return for which Yeakes promised Blanos that at Yeakes's death he would leave all of his property to Blanos. When the testimony of Jim Gorgwitch is supplemented by that of others set out in the statement of facts, the judgment of this court must be an affirmance of the action of the trial judge in overruling the general grounds of the defendants' motion for new trial.
Certain contentions of the defendant will now be noticed. Jim Gorgwitch testified that Yeakes said that Blanos was "my boy" and that he liked him and was going to do everything he could for him, and the witness heard Yeakes tell Blanos that, if he should marry, he would buy him a home, furniture, and everything he wanted; that at that time the witness reminded Yeakes that Blanos had a mother and a father, and Yeakes replied, "I like the boy and I do everything I can for him as long as I like him." On another occasion, according to the same witness, Yeakes told him twice in the presence of Blanos that "he ain't got nobody or a home and he ain't got nobody in this world, and he might as well leave it to George as anybody he knows," and Yeakes further said, "Everything I got I am going to leave it to George." From such portion of the testimony of Jim Gorgwitch it is contended by the defendant that there was a conflict on the main issue in the case, and that the most that can be said is that the evidence, properly construed, does not show a contract but only the expression of gratitude by Yeakes for services rendered; and that, as ruled in Barnett v. Henry, 200 Ga. 365
(37 S.E.2d 340), the wishes and desires of the intestate can not be substituted for a contract such as would authorize *Page 566 
a decree for specific performance. Standing alone, the testimony just mentioned would not authorize a decree for specific performance, but as we have already shown, there was testimony which clearly established and proved the contract relied upon, and the evidence of Yeakes's gratitude or expression of intention to leave his property to Blanos is not inconsistent with and does not negative the other testimony showing a precise contract and full performance. We are also referred to testimony that, before being taken to the hospital in his last illness, Yeakes, while at the restaurant and after remarking that, "If anything happens to me I leave everything I got to George," pointed to the cash register and said to Gorgwitch, "There's money there and the bills and stuff I paid out of the drawer," and "That is yours and take care of it." It is insisted that thus a conflict is raised as to the exact contract, this testimony showing an intention that the money in the cash register belong to Jim Gorgwitch, and only the remainder of Yeakes's property go to Blanos, the petitioner. This argument, however, overlooks the fact that the disposition of the money in the cash register was not made as of the time of the alleged contract to leave everything to Blanos, and that the jury was authorized to find that this was not a gift, but simply the adjustment of some partnership interest of Gorgwitch, since he testified that Yeakes said he was to have it "because he didn't pay me that agreement when I left there."
It is also contended that the evidence shows that the services rendered by the petitioner in and about the restaurant were on behalf of the partnership and not to Yeakes individually. The contract is shown to have been entered into in 1942 before Gorgwitch became a partner with Yeakes in that year. As then made it contemplated services to Yeakes in his business, but the fact that Gorgwitch became a partner in the operation of the restaurant, and Blanos' services were rendered to that business, does not fail to show a performance of the agreement. Yeakes's business appears mainly to have been the operation of the restaurant, but though he did not own the entire interest therein, in serving the partnership Blanos was serving Yeakes because he was vitally interested in its success.
It is further argued that, whereas the petition alleged that the services of Blanos in advising and helping Yeakes in his business matters were worth at least $2000 per year, the testimony of Jim *Page 567 
Gorgwitch was that the services to the restaurant were worth about $1000 "apiece" to the partners; and that, as the services were not performed but for about two years, the disproportion in values is too great for the award in equity of an estate of $25,000. The testimony of Gorgwitch was that Blanos's services to the business were worth about $2000. His further statement that they were worth $1000 "apiece" was merely an appraisal from the standpoint of his partnership interest. The business in which Gorgwitch became a partner with Yeakes was the same business for which Blanos's services were contracted by Yeakes, and the fact that Gorgwitch shared in the benefits of Blanos's services does not show any failure of Blanos to contribute services, contracted for by Yeakes, of the value of $2000. As previously pointed out, services of such value for an expectancy of 16.21 years would amount to more than the value of the estate.
The further contention that the evidence shows that Blanos was in fact paid for his services to the restaurant is not borne out by the record. The testimony of Gorgwitch on this point is that Blanos was paid no salary, and while occasionally Gorgwitch gave him $10 or other small sum from the business, it was only a gratuity and he never knew Yeakes to give or pay him anything.
3. The special ground of the motion for new trial complaining of the charge of the court as to the incompetency of the petitioner to testify in the case is without merit. The charge stated a correct and applicable principle of law, and was not harmful or confusing to the jury in any respect. The issue was whether or not the deceased had in his lifetime made a contract with the petitioner as contended by him, and obviously the petitioner was incompetent to testify as to any transaction or communication with the deceased respecting this issue. Whether or not he could, as argued by the plaintiff in error, have testified to transactions or communications not in his own favor, is merely to present an academic question entirely foreign to the real issue or required testimony here. Certainly no harm resulted to the defendant by reason of this charge.
The charge of the court, that the testimony of an unimpeached witness, where there is no other testimony or evidence in conflict with his, can not arbitrarily be disregarded, stated an applicable and sound principle of law. Of course, the stated rule does not mean that the jury are obliged to believe testimony which under *Page 568 
the facts and circumstances they discredit, but means that they are to consider the testimony of every witness who is sworn, and not arbitrarily disregard the testimony of any witness.Brunswick Western R. Co. v. Wiggins, 113 Ga. 842, 844 (1) (39 S.E. 551, 61 L.R.A. 513); Wilson v. Gray, 34 Ga. App. 320
(129 S.E. 297); Fincher v. Harlow, 56 Ga. App. 578,581 (193 S.E. 452). The court was not obliged to charge as to the impeachment of witnesses where no request was made, and if any additional instruction was desired a proper written request should have been made. L. N. R. Co. v. Thompson, 113 Ga. 983
(1) (39 S.E. 483); Cutis v. Geiger, 176 Ga. 864 (4) (169 S.E. 127). Certain testimony of the witness Gorgwitch, pointed out by the movant as creating a discrepancy in his testimony, does not in fact amount to such, and the charge as given was not error.
The charge of the court complained of in the third special ground of the motion, that "the fairness of a contract is usually to be determined as of its date, and the happening of subsequent events within the reasonable contemplation of the parties does not afford a defense," stated a principle of law which was pertinent and applicable in the present case, and was not error for any reason assigned.
The refusal to admit in evidence a certain document, as complained of in the fourth special ground of the motion, was not error for any reason assigned. It purported to be only a copy or original of a written appearance and claim filed in the Court of Ordinary of McDuffie County, Georgia, by two alleged closest kin of Peter Yeakes, through two named attorneys, in the matter of the estate of Yeakes, but it was neither sworn to nor certified, and clearly was not admissible as evidence for any purpose.
Judgment affirmed. All the Justices concur, except Atkinsonand Head, JJ., who dissent.